## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 28 2020, 8:29 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT S.H.

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEY FOR APPELLANT J.K.

Roberta L. Renbarger
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of A.H. and K.K. (Minor Children)

and

S.H. (Father) and J.K. (Mother),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

August 28, 2020

Court of Appeals Case No. 20A-JT-750

Appeal from the Allen Superior Court

The Honorable Charles F. Pratt, Judge

Trial Court Cause Nos.
02D08-1905-JT-288
02D08-1905-JT-289

**Bailey, Judge.**

# Case Summary

[1] S.H. ("Father") and J.K. ("Mother") appeal[1] the trial court's judgments terminating their parental rights to their children, A.H. and K.K (collectively "Children"). They raise the following restated, consolidated issue on appeal: whether the trial court clearly erred when it terminated their parental rights.

[2] We affirm.

# Facts and Procedural History

[3] Father and Mother are the parents of A.H., born May 21, 2015, and K.K., born December 19, 2016.[2] In May of 2017, Father was charged with domestic violence in the presence of Children as a Level 6 felony which resulted in a no-contact order as to Mother. In July of 2017, the Indiana Department of Child Services ("DCS") received a report that: the family had been evicted from a home that had no electricity or running water; they had then moved in with family members who later "kicked them out of the home," Tr. V. I at 56; Mother was using illegal drugs; the children were dirty when they got to school; Father had engaged in a "domestic altercation" with Mother in the presence of

---

[1] We granted the State's motion to consolidate the parents' separate appeals.

[2] The trial court mistakenly stated in its Appealed Order that K.K. was born on September 11, 2017. Appealed Order at 1.

Children, Ex. at 14, 15; and Father was "unable to remove [Children] from a neglectful environment," *id*. at 15. Mother informed DCS Family Case Manager ("FCM") Tana Selzer ("FCM Selzer") that Mother and Children had been living in a tent behind Children's paternal grandfather's ("Paternal Grandfather") house and were now living in a hotel. Mother stated that she intended to pay for the hotel room that night with tips she would earn working at a nightclub that evening. DCS removed Children and placed them in foster care.

[4] On August 14, 2017, and September 10, 2017, DCS filed a Child in Need of Services ("CHINS") petition and amended CHINS petition, respectively. Following a September 11 initial hearing, the trial court issued an Order finding that Mother and Father admitted to the relevant allegations in the amended CHINS petition, and the court concluded that Children were CHINS. Specifically, Mother admitted Children were CHINS, and Father admitted A.H. was a CHINS and admitted some allegations against him as to both children. Ex. at 15, 53. Both parents were ordered, among other things, to maintain clean, safe, and appropriate housing, maintain contact with DCS, provide DCS with consents to releases of information, visit with Children, and submit to diagnostic testing. Mother was also ordered to enroll in, participate in, and successfully complete home-based counseling services. Father was also ordered to submit to random drug screens and "abide by the terms of [his] criminal matter." *Id*. at 58. The Children's continued placement was in foster care.

[5]     Father participated in supervised visitation with Children between August and November of 2017. However, Father did not complete the diagnostic assessment ordered by the court, and he tested positive for marijuana. In the pending domestic violence charges relating to the May 2017 battery against Mother in the presence of Children, Father had been released from incarceration on bond. However, Father's bond was revoked in November 2017 due to his failure to appear at a hearing, and he was incarcerated once more. On February 7, 2018, Father pled guilty to the domestic violence charge. Father was convicted and sentenced to one year and 183 days incarceration, suspended to probation, and was ordered to complete therapeutic services through the Center for Nonviolence. Father's release from incarceration to probation began on March 18, 2018.

[6]     On July 25, 2018, Father's probation was revoked because he admittedly violated the terms of his probation by committing Invasion of Privacy through violation of the no-contact order and Operating a Vehicle with an ACE of .15 or more. On November 20, 2018, Father was sentenced to 183 days imprisonment for the two new offenses. The criminal court also ordered Father to serve his original one year, 183-day term of imprisonment. Father was incarcerated continuously from July 2018 until June 2019.

[7]     On February 21, 2019, the trial court held a permanency hearing in the CHINS matter and found that Mother was not enrolled in therapy, was not cooperating with home-based services, had not regularly visited Children, and did not have stable housing. The court also found that Father was still incarcerated. The

trial court changed Children's permanency plan to termination of parental rights with adoption.

[8]     On June 12, 2019, DCS filed its petition to terminate parents' rights as to Children. The court held fact-finding hearings on October 31 and December 9, 2019. Children's parents, employees of Lifeline Youth and Family Services ("LYFS"), the DCS FCMs, and the court-appointed Guardian Ad Litem ("GAL") all testified. In an order dated March 4, 2020, the trial court terminated Mother's and Father's parental rights. The court issued the following relevant findings not yet discussed:

> 17.     The father has a history of criminal behavior including a conviction for burglary in 2011 and a subsequent revocation of probation. He was revoked on his probation related to the domestic battery charge (see above) and, as of the closure of evidence in this case, is on parole.
>
> 18.     The father reports employment in Huntington County, Indiana. Although he asserts that he is residing with his father, the Department was not able to confirm that representation with his father. The Respondent father has acknowledged that he sometimes stays with friends.
>
> 19.     The father did not have sustainable housing suitable for the children at the time evidence was closed in this case.
>
> 20.     The father regularly maintained visits with his children when he was not incarcerated. The father's visitations were supervised by Katherine Devinney of Lifeline Family Services between December, 2018[,] and May, 2019. From her testimony the Court finds that she observed the

children to be anxious during their visits. She expressed concerns with regard to the father's means of correcting the children. The subsequent visitation supervisor, Natalie Aker, similarly voiced concerns and recommended that the father complete parenting instruction.

21. From the testimony of Department case worker Irene Tillman, the Court finds that the father was referred to parenting classes following his completion of a diagnostic assessment. But he did not complete the service.

22. From the testimony of Department case worker Irene Tillman, the Court also finds that the father was referred to a fatherhood engagement program. Although he started the service he did not complete it and the referral was suspended.

23. The father has not signed requested releases of information so that the Department may communicate with his parole officer. He has not completed the services through the Center for Non[v]iolence.

24. The mother has not provided the Department with her current address[,] advising that the people with whom she is living do not want the Department's involvement.

25. The mother reports an income of $2,500.00 per week from unreported tips she receives working as a dancer for local nightclub, Brandy's. She performs under a stage name, "Trisha."

26. Notwithstanding her reported income of $2,500.00 per week, the mother has not secured safe, sustainable housing appropriate for her children.

27.     The mother has not completed home based services. She completed a referred medication review but has declined to take prescribed medication for depression. She has not completed individual and group dialectical behavior therapy (DBT) as recommended by her diagnostic evaluation.

28.     Should parental rights be terminated the Department has an appropriate plan, that being adoption. The children are placed in a pre-adoptive home.

29.     The child's Guardian ad Litem has concluded that the children's best interests are served by the termination of parental rights. In support of her conclusion she cites the parent's failure to complete services and their inability to secure safe sustainable housing for the children. She has concluded that the children's best interests are served by their adoption by their foster parents.

Appealed Order at 3-4.

[9]     The trial court concluded that there was "a reasonable probability that the reasons that brought about the [Children's] placement outside the home will not be remedied[,]" *id.* at 4, and that termination of Mother's and Father's parental rights was "in the children's best interests[,]" *id.* at 5. Therefore, the trial court terminated the parents' parental rights. Mother and Father now appeal.

# Discussion and Decision

## Standard of Review

Mother and Father maintain that the trial court's order terminating their parental rights was clearly erroneous. We begin our review of this issue by acknowledging that the traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution. *See*, *e.g.*, *In re C.G.*, 954 N.E.2d 910, 923 (Ind. 2011). However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *In re K.S.*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove, among other things:

> (A) that one (1) of the following is true:

> \* \* \*

>> (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

> (i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii)  The child has, on two (2) separate occasions, been adjudicated a child in need of services.

* * *

(C) [and] that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2). DCS need establish only one of the requirements of subsection (b)(2)(B) before the trial court may terminate parental rights. *Id.* DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[12] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Furthermore, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child

relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[13] Here, in terminating Mother's and Father's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we first determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

## Challenge to Trial Court's Factual Findings

[14] Mother does not challenge any of the trial court's findings of fact; therefore, we accept those findings as true as to Mother. *See, e.g.*, *In re S.S.*, 120 N.E.3d 605, 610 (Ind. Ct. App. 2019). Father challenges the following findings of fact.[3]

*Challenged Finding Regarding Reasons for Removal*

[15] Father challenges the factual statement in Finding number 6 that he "admitted that [he and Mother] were unable to provide the children with safe sustainable housing." Appealed Order at 2. The CHINS petition alleged that Mother, who

---

[3] Father also challenges some of the factual statements contained in Conclusion of Law number 2.

had custody of Children, was unable to provide Children with stable housing, and Father was "unable to remove [Children] from a neglectful environment." Ex. at 15. It also alleged there was a no-contact order in place between Mother and Father. The court's initial CHINS order shows that Father admitted A.H. was a CHINS and admitted to other relevant CHINS allegations, including the allegation that he and Children "would benefit from the intervention of the court in order to receive support and services they would not receive without the intervention of the court." *Id.* at 15, 54. Father points to no evidence indicating why A.H. would be a CHINS, but K.K. would not; indeed, the evidence shows Children were living in the same situation.

[16] In addition, Father admitted at the termination hearing that the CHINS action was initiated because of housing issues and admitted that Mother, who had custody of Children, was living with Children in a tent in Paternal Grandfather's back yard at time they were removed. Father also admitted that there was a no-contact order in place at the time Children were removed, and that it prohibited him from having contact with Mother. It is reasonable to infer from those facts that Children were in an unstable housing situation from which Father could not remove them.

[17] There was sufficient evidence to support finding number 6.

*Challenged Findings Regarding Father's Lack of Housing*

[18] Father challenges factual statements in Findings 18 and 19 and Conclusion 2 that he did not have stable housing at the time of the termination hearing.

However, that finding is supported by the testimony of FCM Irene Tillman ("FCM Tillman"), who was the family's case manager from February 2018 to the time of the termination hearing. FCM Tillman testified at the termination hearing that Father never provided her with an address where he consistently resided. He indicated at some point that he lived with Paternal Grandfather; however, when FCM Tillman called Paternal Grandfather in October 2019 to confirm, Paternal Grandfather stated that Father did not live with him. When confronted with that information, Father told FCM Tillman that he also sometimes stays with friends. That evidence is sufficient to support the finding that Father did not have stable housing. Father points to his own conflicting testimony; however, we may not reweigh the evidence or witness credibility. *In re D.D.*, 804 N.E.2d at 265.

*Challenged Finding Regarding Supervised Visitation*

[19] Father notes that Finding 20 erroneously states that his visitations with Children were supervised by Katherine Devinney ("Devinney") of Lifeline Youth and Family Services ("LYFS"), who "observed the children to be anxious during their visits" and "expressed concerns with regard to the father's means of correcting the children." Appealed Order at 3. As the State acknowledges, the trial court did err in finding that Devinney supervised Father's visits with Children; Father's visitations were supervised by LYFS family consultants Megan Rosswurm ("Rossurm") and Natalie Akers ("Akers"). However, the error in supervisor names was harmless as the actual

supervisors of Father's visits also testified that Father overcorrected Children, which caused them to be anxious.

[20]    Moreover, finding 20—relating to visitation—was not one of the findings that provided the basis for the trial court's conclusions and judgment. This Court has noted that we are to

> disregard any special finding that is not proper or competent to be considered. *Riehle v. Moore*, 601 N.E.2d 365, 369 (Ind. Ct. App. 1992). Additionally, such a finding cannot form the basis of a conclusion of law. *Id*. We may reverse a trial court's judgment, however, only if its findings constitute prejudicial error. *Id*. A finding of fact is not prejudicial to a party unless it directly supports a conclusion. *Id*.

*In re B.J.*, 879 N.E.2d 7, 19-20 (Ind. Ct. App. 2008), *trans. denied*. As discussed below, the trial court's conclusions were based on findings other than Father's visitations with Children. Because Finding 20 did not directly support any of the trial court's conclusions, any error in that finding was not prejudicial. *See id*.

*Challenged Findings Regarding Father's Failure to Complete Services*

[21]    Father admits that he failed to engage in and/or complete required parenting classes, the Fatherhood Engagement program, and services at the Center for Nonviolence. But Father challenges factual statements in Findings 21, 22, and 23 and in Conclusion 2 that "suggest Father was to blame" for that failure.

Father's Br. at 19. However, there is sufficient evidence that Father was responsible for the failure to engage in services.

[22] In its September 11, 2017, dispositional order, the CHINS court required that Father complete a parenting assessment by October 11, 2017, and follow all recommendations. Father failed to do so even though he was not incarcerated at the time. Father was also not incarcerated from March 2018 to July 2018 but again failed to obtain the parenting assessment during that time. Father finally obtained the parenting assessment in November 2019—although he had been released from reincarceration since June 2019. However, Father failed to engage in and complete the parenting classes to which the parenting assessment referred him. Father contends that that failure was due to the fact that he was not given the referral to the parenting classes until "three weeks prior to" the termination hearing, i.e., October 31, 2019. Father's Br. at 19. However, the delay in Father being referred to parenting classes was due to his own failure to timely obtain a parenting assessment that recommended such a referral. And FCM Tillman testified that she referred Father to Quality Counseling after she received confirmation that Father finally had obtained the assessment in November 2019. She testified that the service provider telephoned Father on three separate occasions at the end of November 2019 but Father never returned those calls.

[23] FCM Tillman also testified that Father began to engage in the Fatherhood Engagement program after he was released from incarceration in June 2019, but he was suspended from the program due to missed appointments. And, as

a term of his probation, Father was also ordered to complete services through the Center for Nonviolence. He was released to probation from incarceration—and therefore able to engage in the domestic violence classes—from March 2018 to July 2018. But Father failed to engage in services at the Center for Nonviolence at any time.

[24] There is sufficient evidence to support the trial court's findings that Father failed to engage in and complete required services when he was able to do so.

*Conclusion Regarding Findings*

[25] The evidence supports the trial court's relevant challenged findings. Father's contentions boil down to requests that we reweigh the evidence and/or judge witness credibility, which we will not do. *In re D.D.*, 804 N.E.2d at 265.

# Conditions that Resulted in Child's Removal/Continued Placement Outside the Home

[26] Both Mother and Father maintain that the trial court erred in finding a reasonable probability that the conditions that resulted in Child's removal and continued placement outside the home will not be remedied. We must determine whether the evidence most favorable to the judgment supports the trial court's conclusion. *In re D.D.,* 804 N.E.2d at 265; *Quillen*, 671 N.E.2d at 102. In doing so, we engage in a two-step analysis. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). "First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied." *Id*. (quotations and citations omitted).

[27] In the first step, we consider not only the initial reasons for removal, but also the reasons for continued placement outside the home. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). In the second step, the trial court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re E.M.*, 4 N.E.3d at 643. However, the court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Moore v. Jasper Cty. Dep't of Child Servs.*, 894 N.E.2d 218, 226 (Ind. Ct. App. 2008) (quotations and citations omitted); *see also In re M.S.*, 898 N.E.2d 307, 311 (Ind. Ct. App. 2008) (noting the "trial court need not wait until a child is irreversibly harmed such that his physical, mental, and social development are permanently impaired before terminating the parent-child relationship"). In evaluating the parent's habitual patterns of conduct, the court may disregard efforts made shortly before the termination hearing and weigh the history of the parent's prior conduct more heavily. *In re K.T.K.*, 989 N.E.2d 1225, 1234 (Ind. 2013). And DCS is not required to rule out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *Moore*, 894 N.E.2d at 226.

[28] Here, Children were removed because the parents could not provide them with a safe, stable living environment. Specifically, among other things, the family had been evicted from a home that had no electricity or running water and had then moved in with family members who later "kicked them out of the home," Tr. V. I at 56; Father had engaged in a "domestic altercation" with Mother in

the presence of Children, Ex. at 14, 15; and Father was "unable to remove [Children] from a neglectful environment," *id*. at 15.

[29] Mother asserts that she has remedied the reason for Children's removal because she testified that she was living with a friend, that Children could live with her at her friend's residence, and that she had a bedroom and beds for Children. However, the trial court conclusion to the contrary is supported by evidence that Mother refused to give DCS her address, thereby prohibiting them from inspecting and verifying her allegedly safe and appropriate home for Children. And even Mother's own testimony does not establish that Mother has a lease or any other legal right to stay at her friend's residence. In addition, the evidence establishes that Mother has failed to engage in the home-based services to which she was referred. That evidence is sufficient to support the trial court's finding that Mother "has not secured safe, sustainable housing appropriate for her children." And that finding supports the trial court's conclusion that there is a reasonable probability that Mother has not remedied, and will not remedy, the reasons for Children's removal. Mother's contentions to the contrary are simply requests that we reweigh the evidence, which we may not do.

[30] Father admits that Children were originally removed due to a "lack of stable housing" and were not returned to him because of his "incarceration, alleged lack of stable housing, and failure to complete services." Father's Br. at 22. However, Father maintains that he had "cured all of those issues to the extent possible" by the time of the termination hearing. *Id*.

Father's claims do not account for the evidence—discussed above in relation to the challenged findings—that he did not have stable housing at the time of the termination hearing, was repeatedly incarcerated during large portions of the pending CHINS and TPR cases, and failed to engage in services meant to improve his ability to parent and refrain from domestic violence. Rather, Father's assertions are merely requests that we reweigh the evidence. Again, we may not do so. *E.g., In re D.D.*, 804 N.E.2d at 265. The trial court did not clearly err in concluding that Father has not remedied—and is not likely to remedy—the conditions that led to Children's removal and continued placement outside the home.

## Best Interests

In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010). "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests." *In re A.K.*, 924 N.E.2d at 224. Such evidence, "in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by

clear and convincing evidence that termination is in the child's best interests." *In re A.D.S.*, 987 N.E.2d 1150, 1158-59 (Ind. Ct. App. 2013), *trans. denied*.

[33]     Again, parents' contentions on this issue amount to requests that we reweigh the evidence, which we will not do. The evidence most favorable to the judgment shows that "neither parent ha[d] secured housing appropriate for the placement of the Children." Appealed Order at 5. The evidence also showed that neither parent had complied with services required to improve their abilities to parent. Furthermore, the evidence established that Children were in a pre-adoptive home that provided them with consistency of care. And both FCM Tillman and GAL Jennifer Young ("GAL Young") testified that they believed termination of parental rights was in Children's best interests, especially given Children's need for stability and parents' continuous and on-going inability to provide the same. GAL Young also testified that termination was in Children's best interests because parents have been seen together despite the on-going no-contact order, and Father has failed to engage in services related to domestic violence. Given that testimony, in addition to evidence that Children need permanency and stability that neither parent can provide and the reasons for Children's removal will not likely be remedied, the totality of the evidence supports the trial court's conclusion that termination is in Children's best interests. *In re A.D.S.*, 987 N.E.2d at 1158-59.

# Conclusion

[34]     The evidence in the record supports the trial court's relevant findings of fact, and those findings support the trial court's conclusion that Mother's and Father's parental rights should be terminated. The trial court did not commit clear error by so ruling.

[35]     Affirmed.

Vaidik, J., and Baker, Sr. J., concur.